1

2

3

4

5

6

7

8

9              IN THE UNITED STATES DISTRICT COURT

10                  FOR THE DISTRICT OF OREGON

11                      PORTLAND DIVISION

12  SECUNDINO BAEZ,                )
                                   )
13                  Plaintiff,     )
                                   )
14       v.                        )
                                   )
15  UNITED STATES OF AMERICA;      )    No.  CV-09-662-HU
    JANET NAPOLITANO, Secretary    )
16  of Homeland Security of the    )
    United States; ALEJANDRO       )
17  MAYORKAS, USCIS Director;      )
    CHRISTINA POULOS, Director,    )
18  USCIS California Service       )    OPINION & ORDER
    Center; ERIC HOLDER, United    )
19  States Attorney General,       )
                                   )
20                  Defendants.    )
                                   )

21

22  Stephen W. Manning
    Jennifer M. Rotman
23  Jessica M. Boell
    IMMIGRANT LAW GROUP, P.C.
24  P.O. Box 40103
    Portland, Oregon 97240
25
        Attorneys for Plaintiff
26

27  / / /

28  / / /

1 - OPINION & ORDER

Tony West
ASSISTANT ATTORNEY GENERAL
Civil Division
David J. Kline
DIRECTOR, DISTRICT COURT SECTION
Office of Immigration Litigation
Gjon Juncaj
SENIOR LITIGATION COUNSEL
Adam Laurence Goldman
TRIAL ATTORNEY
United States Department of Justice, Civil Division
Office of Immigration Litigation, District Court Section
Liberty Square Building
450 Fifth Street, NW, Room 6224
Washington, D.C. 2001

Dwight C. Holton
ACTING UNITED STATES ATTORNEY
District of Oregon
James E. Cox, Jr.
ASSISTANT UNITED STATES ATTORNEY
United States Attorney's Office
District of Oregon
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2902

    Attorneys for Defendants

HUBEL, Magistrate Judge:

    Plaintiff Secundino Baez brings this immigration action against the United States, Secretary of Homeland Security Janet Napolitano, United States Citizenship and Immigration Services (USCIS) Director Alexander Mayorkas, USCIS California Service Center Director Christina Poulos, and United States Attorney General Eric Holder.

    Plaintiff's Second Amended Complaint has five claims, discussed more fully below. Defendants move to dismiss the action based on the lack of subject matter jurisdiction. Alternatively, defendants move for summary judgment on all claims. In response to defendants' motion, plaintiff voluntarily dismisses his second claim for relief. Pltf's Mem. in Sup. of Pltf's MSJ at p. 5 n.1 (stating that plaintiff dismisses his second claim for relief

2 - OPINION & ORDER

without prejudice because it is moot).  Plaintiff moves for summary
judgment on his remaining four claims.

All parties have consented to entry of final judgment by a
Magistrate Judge in accordance with Federal Rule of Civil Procedure
73 and 28 U.S.C. § 636(c).  For the reasons explained below, I
grant defendants' motion and deny plaintiff's motion.

BACKGROUND

In 1963, plaintiff, a citizen of Cuba, entered the United
States.  He was about three years old.  He was paroled into the
United States under 8 U.S.C. § 1182(d)(5).[1]  Plaintiff has remained
in the United States, without interruption, for the nearly forty-
seven years since his arrival here.

In 1986, plaintiff applied to adjust his status to that of a
lawful permanent resident pursuant to Section 1 of the Cuban
Refugee Adjustment Act of 1996 (CAA).  Pub. L. 89-732, 80 Stat.
1161 (1966).  On February 5, 1991, plaintiff's application for
adjustment of status to permanent resident was denied for failure
to submit requested documentation.

In 2007, plaintiff filed a second application to adjust his
status to that of a lawful permanent resident pursuant to the CAA.
On February 21, 2008, the USCIS denied plaintiff's application.

---

[1]  The statute gives the Attorney General the discretion to
"parole into the United States temporarily under such conditions
as he may prescribe only on a case-by-case basis for urgent
humanitarian reasons or significant public benefit any alien
applying for admission to the United States[.]"  8 U.S.C. §
1182(d)(5)(A).  Parole status, however, "shall not be regarded as
an admission of the alien," id., and thus, is not a "lawful entry
of the alien into the United States."  8 U.S.C. § 1101(a)(13)(A).

On May 3, 2008, the Department of Homeland Security issued plaintiff a Notice to Appear, charging him with being removable pursuant to 8 U.S.C. § 1182(a)(7)(A)(i).  Plaintiff has had hearings before the immigration court on the following dates, all in connection with this charge of removability:  November 4, 2008, March 17, 2009, April 9, 2009, June 12, 2009, and October 22, 2009.

At the time of the March 3, 2010 oral argument on the motions at issue here, counsel represented that plaintiff had had an additional hearing on February 23, 2010, at which a July 2012 date was set for a merits hearing.

In the context of the removability hearings pending before the Immigration Judge (IJ), in March 2009 plaintiff (1) filed an application for Asylum and Withholding of Removal, (2) renewed his application to adjust his status to permanent resident pursuant to the CAA, and (3) filed an application for Cancellation of Removal.

On August 31, 2009, the USCIS vacated, reopened, and reconsidered its prior decision from February 2008 regarding plaintiff's second adjustment of status application. Simultaneously, however, the USCIS notified plaintiff of its intent to deny the adjustment application because plaintiff had not clearly established eligibility for adjustment. Admin. Record (AR) at pp. 10-12.  Plaintiff was given thirty days to respond to this Notice of Intent to Deny (NOID).  Id.  On September 29, 2009, plaintiff responded to the NOID with a six-page letter memorandum and other documents.  AR at pp. 13-18.  On October 14, 2009, the USCIS denied plaintiff's application.  AR at pp. 4-7.

The instant action was initially filed on June 15, 2009, before the USCIS vacated, reopened, reconsidered, and re-denied

4 - OPINION & ORDER

plaintiff's second adjustment application.    The Second Amended Complaint was filed on November 25, 2009, after the USCIS's October 14, 2009 denial of that application.

Additional facts are discussed below.

STANDARDS

I.  Motion to Dismiss for Lack of Subject Matter Jurisdiction

A motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(1) addresses the court's subject matter jurisdiction. The party asserting jurisdiction bears the burden of proving that the court has subject matter jurisdiction over his claims. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).

A Rule 12(b)(1) motion may attack the substance of the complaint's jurisdictional allegations even though the allegations are formally sufficient. See Corrie v. Caterpillar, Inc., 503 F.3d 974, 979-80 (9th Cir. 2007) (court treats motion attacking substance of complaint's jurisdictional allegations as a Rule 12(b)(1) motion); Dreier v. United States, 106 F.3d 844, 847 (9th Cir. 1996) ("[U]nlike a Rule 12(b)(6) motion, a Rule 12(b)(1) motion can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency[.]") (internal quotation omitted). Additionally, the court may consider evidence outside the pleadings to resolve factual disputes. Robinson v. United States, 586 F.3d 683, 685 (9th Cir. 2009); see also Dreier, 106 F.3d at 847 (a challenge to the court's subject matter jurisdiction under Rule 12(b)(1) may rely on affidavits or any other evidence properly before the court).

/ / /

5 - OPINION & ORDER

II.  Summary Judgment

     Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

     "If the moving party meets its initial burden of showing 'the absence of a material and triable issue of fact,' 'the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense.'"  Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991) (quoting Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987)).  The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial.  Celotex, 477 U.S. at 322-23.

     The substantive law governing a claim determines whether a fact is material.  T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  All reasonable doubts as to the existence of a genuine issue of fact must be resolved against the moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).  The court should view inferences drawn from the facts in the light most favorable to the nonmoving party.  T.W. Elec. Serv., 809 F.2d at 630-31.

     If the factual context makes the nonmoving party's claim as to

6 - OPINION & ORDER

1  the existence of a material issue of fact implausible, that party

2  must come forward with more persuasive evidence to support his

3  claim than would otherwise be necessary.  Id.; In re Agricultural

4  Research and Tech. Group, 916 F.2d 528, 534 (9th Cir. 1990);

5  California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics,

6  Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).

7                              DISCUSSION

8  I.  Plaintiff's Claims

9       Plaintiff has four remaining claims.  In his first claim for

10  relief, he challenges the denial of his second application for

11  adjustment to permanent resident status.  He alleges that the

12  denial violates the CAA, the Immigration and Nationality Act (INA),

13  the applicable regulations and policy, and the Administrative

14  Procedures Act.  He seeks an adjudication of his permanent resident

15  application based on the appropriate legal standard.

16       In his third claim for relief, plaintiff contends that

17  defendants' denial of his second application for adjustment to

18  permanent resident status violates the CAA, the INA, the applicable

19  regulations and policy, and the Administrative Procedures Act

20  because it is not based on substantial evidence.  He seeks an

21  adjudication of his permanent resident application based on the

22  record.

23       In his fourth claim for relief, plaintiff contends that a 2009

24  ruling by the Bureau of Immigration Appeals (BIA) in Matter of

25  Martinez-Montalvo, 24 I&N Dec. 778 (BIA 2009), which plaintiff

26  asserts prohibits him from seeking an adjustment to permanent

27  resident status in the context of his removal proceedings, violates

28  the CAA, the INA, the applicable regulations and policy, and the

7 - OPINION & ORDER

Administrative Procedures Act. He seeks to present a full defense to removal, including raising an adjustment claim under the CAA, before the IJ.

In his fifth claim for relief, plaintiff contends that defendants' reliance on Martinez-Montalvo violates the CAA, the INA, the applicable regulations and policy, the United States Constitution, and the Administrative Procedures Act because it is impermissibly retroactive. Plaintiff seeks to have his application for adjustment under the CAA adjudged in accordance with the rules in effect on the date of his filing.

Because subject matter jurisdiction is a threshold issue, I address defendants' motion first.

II. Subject Matter Jurisdiction Over Plaintiff's Fourth & Fifth Claims for Relief

Martinez-Montalvo, decided in April 2009, overturned the 2001 BIA decision In re Artigas, 23 I&N Dec. 99 (BIA 2001). Both decisions concern the ability of certain aliens to seek an adjustment of status to permanent resident in the context of removal proceedings. Although not directly relevant to the subject matter jurisdiction determination, a review of some statutory history provides context for the discussion.

Before 1996, the then-Immigration and Naturalization Service (INS) conducted (1) deportation hearings to deport aliens who had actually entered the United States, and (2) exclusion hearings to bar entry into the United States for those aliens seeking to enter the country. See Eligibility of Arriving Aliens in Removal Proceedings to Apply for Adjustment of Status and Jurisdiction to Adjudicated Applications for Adjustment of Status, 71 Fed. Reg.

8 - OPINION & ORDER

27585-01, 2006 WL 1288099 (May 12, 2006) (explaining history of regulations).

Before 1996, adjustment of status applications, including those brought under the CAA, were exclusively presented to an IJ if deportation proceedings against the alien had been initiated. However, aliens in exclusion hearings could not pursue an adjustment of status application with the IJ.  Rather, such aliens were required to file adjustment of status applications with the District Director of the INS (now, the USCIS).

After the 1996 passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009 (1996), all proceedings, whether "deportation" or "exclusion," were considered "removal" proceedings.  Id.  The distinction between "admitted" and "seeking admission" aliens was still relevant, however.  Presently, post-IIRIRA, if an alien is seeking admission, the alien is charged in removal proceedings as an inadmissible alien under 8 U.S.C. § 1182.  If the alien has been admitted, the alien is charged in removal proceedings as a deportable alien under 8 U.S.C. § 1227.  Those aliens seeking admission are referred to as "arriving aliens."  See Martinez-Montalvo, 24 I&N Dec. at p. 780 (noting the continued distinction after passage of IIRIRA, "between aliens who have been admitted and those seeking admission, i.e. arriving aliens.").

In implementing the IIRIRA, the Attorney General adopted rules that continued the tradition of denying arriving aliens the opportunity to seek adjustment of status before an IJ as a form of relief from removal.  Eligibility of Arriving Aliens, 71 Fed. Reg. at 27587.  The agency adopted 8 C.F.R. § 245.1(c)(8), and then

9 - OPINION & ORDER

1   later 8 C.F.R. § 1245.1(c)(8)[2], both of which provided that an

2   arriving alien placed in removal proceedings was ineligible for an

3   adjustment of status. Id. This was no different than the pre-

4   IIRIRA law which had also denied arriving aliens the ability to

5   seek an adjustment of status in the context of an exclusion

6   hearing. But, in addition to adopting these regulations, another

7   new regulation prohibited arriving aliens in removal proceedings

8   from filing an adjustment of status application with the USCIS as

9   well. 8 C.F.R. § 245.2(a). This was a change from the pre-IIRIRA

10   law which had allowed arriving aliens in exclusion proceedings to

11   seek an adjustment of status with the then-INS.

12       Challenges to the new regulations were mounted and arguments

13   were made that the regulations were inconsistent with 8 U.S.C. §

14   1255(a) which allows for an application for discretionary

15   adjustment of status by any alien who was "inspected and admitted

16   or paroled."

17       In Artigas, the specific challenge was brought under the CAA.

18   The alien was seeking an adjustment of status under the CAA in the

19   context of his removal proceeding. The government, relying on 8

20   C.F.R. § 245.1(c)(8), argued that arriving aliens placed in removal

21   proceedings could not pursue an adjustment of status under the CAA.

22   The BIA rejected that position, holding that the IJ had

23   jurisdiction to adjudicate adjustment applications under the CAA in

24

25       [2] As explained in Bona v. Gonzales, 425 F.3d 663, 665 n.1

26   (9th Cir. 2005), these two regulations are identical. 8 U.S.C. §
245.1(c)(8) applied to the immigration agencies within the

27   Department of Homeland Security, while 8 U.S.C. § 1245.1(c)(8)
applied to the immigration courts and the BIA which remain within

28   the Department of Justice.

removal proceedings when a Cuban alien had been charged as an arriving alien without a valid visa or entry document. Artigas, 23 I&N Dec. at 103-05. Artigas noted that if the new regulations were given effect, a Cuban alien in a removal proceeding would have no avenue in which to pursue an adjustment of status because one regulation deprived the alien of the opportunity to pursue the adjustment in the removal proceeding and the other regulation deprived the alien of the opportunity to pursue the adjustment with the USCIS. Id. at 105.

Rather than invalidate the regulations, the Artigas decision focused specifically on the CAA and held that because 8 C.F.R. § 245.1(c)(8) provided that an arriving alien in removal proceedings was ineligible to adjust status to that of a lawful permanent resident "under section 245 of the Act," such ineligibility did not apply to Cuban aliens proceeding under the CAA. Id. at 104. Thus, Artigas carved out an exception to 8 C.F.R. § 245.1(c)(8) for adjustment applications made by arriving aliens under the CAA.

Several courts did confront the validity of 8 C.F.R. § 245.1(c)(8) head on, including the Ninth Circuit which found it invalid and inconsistent with 8 U.S.C. § 1255(a). Bona, 425 F.3d at 668-71. The Bona court held that the regulation, which precluded the plaintiff, a parolee deemed an arriving alien, from applying for adjustment of status before the IJ, directly conflicted with section 1255(a) which allows any alien who has been "inspected and admitted or paroled" into the country to apply for adjustment of status. Id.

Not every court addressing the issue reached the same conclusion, however, with some courts finding the regulation valid.

11 - OPINION & ORDER

1  <u>Eligibility of Arriving Aliens</u>, 71 Fed. Reg. at 27587.  As a
2  result, the Department of Homeland Security and the Department of
3  Justice adopted new regulations in 2006 to avoid inconsistent
4  interpretation of the rules across the country.  <u>Id.</u>

5       Under the new regulations, the "USCIS has jurisdiction to
6  adjudicate an application for adjustment of status filed by <u>any</u>
7  <u>alien</u>, unless the immigration judge has jurisdiction to adjudicate
8  the application under 8 CFR 1245.2(a)(1)."  8 C.F.R. § 245.2(a)
9  (emphasis added).  8 C.F.R. § 1245.2(a)(1) gives IJs who are
10  conducting removal proceedings exclusive jurisdiction to adjudicate
11  adjustment applications by aliens in those proceedings, other than
12  arriving aliens.[3]  Thus, presently, under the 2006 regulations, an
13  arriving alien in removal proceedings cannot pursue an adjustment
14  of status before the IJ, but, that alien can still file an
15  adjustment of status application with USCIS.

16       In <u>Martinez-Montalvo</u>, the BIA held that the new regulations
17  effectively superseded <u>Artigas</u> by "conferring on the USCIS
18  jurisdiction over an application for adjustment of status filed by
19  'any' alien, and by eliminating the jurisdiction of Immigration
20  Judges over 'any' adjustment application filed by an arriving
21  alien[.]"  <u>Martinez-Montalvo</u>, 24 I&N Dec. at 783.  The BIA
22  explained that "[n]ow that the amended regulations assure that
23  arriving aliens who are eligible for relief under the [CAA] can
24  file an adjustment application with the USCIS, we see no reason not
25  to afford the term 'any' its full and natural meaning."  <u>Id.</u>

26  _____

27       [3]  The regulation contains a narrow exception, not
28  applicable here, allowing certain arriving aliens to file an
    adjustment application with the IJ in the removal proceeding.

The BIA further explained that

[i]n other words, there is no longer a need to ascribe a different meaning to the regulatory language to avoid depriving all arriving aliens seeking relief under the [CAA] in removal proceedings of a statutory avenue to adjust their immigration status. Although adjustment under the statute is considered "separate and apart from adjustment of status under section 245 of the Act," Matter of Artigas, supra, at 106, the intent of Congress in enacting the [CAA] is still honored, because arriving aliens may now seek this form of relief before the USCIS, whether or not they are in removal proceedings, and whether or not they are under an order of removal.

Id. Based on this conclusion, the BIA held that the IJ did not have jurisdiction to consider Martinez-Montalvo's CAA adjustment application in the removal proceeding. Id. But, Martinez-Montalvo could elect to file an adjustment application with the USCIS. Id.

In the instant case, plaintiff's removal proceedings were initiated in May 2008 and were in progress when the BIA decided Martinez-Montalvo. The record shows that plaintiff's counsel wrote to the IJ handling plaintiff's case on June 1, 2009, and stated that Martinez-Montalvo represented a "substantial change in the law that materially impacts the case[.]" AR at p. 113. Plaintiff's counsel noted that plaintiff's next hearing before the IJ was scheduled for June 12, 2009. Id. Concurrently with the letter, plaintiff filed a motion to continue the removal hearing. Id.

In his motion to continue, plaintiff argued to the IJ that Martinez-Montalvo was wrongly decided, could not be applied retroactively to him, and could cause a removal order to be entered prior to the completion of judicial review of his adjustment status application. AR at pp. 97-99. He also argued that the current June 12, 2009 hearing date did not allow for adequate briefing of the many complex and novel questions of law raised by Martinez-

1  Montalvo.    Id.

2      The IJ denied the motion to continue in a checklist form

3  order.  AR at p. 96.  However, in a handwritten note at the bottom

4  of the form, the IJ indicated that the motion to continue could be

5  raised at the hearing.    Id.  As indicated above, plaintiff's

6  hearing has clearly been continued since June 2009, and a merits

7  hearing date sometime in July 2012 has now been set.  Thus, the

8  removal proceeding, and any issues attendant to that proceeding, is

9  still pending before the IJ.

10     Defendants argue that this Court lacks subject matter

11 jurisdiction over plaintiff's fourth and fifth claims because these

12 claims relate to questions of law currently pending before the IJ.

13 Because, defendants contend, the issues raised in plaintiff's

14 fourth and fifth claims for relief have not been subject to

15 administrative exhaustion, the issues are not addressed in a final

16 order, a prerequisite to judicial review.  Moreover, defendants

17 add, any judicial review of a decision rendered in a removal

18 proceeding is directly to a circuit court, not a district court.

19 I agree with defendants.

20      The issues raised by plaintiff's fourth and fifth claims are

21 pending before the IJ.  In his memorandum filed in response to

22 defendants' motion to dismiss/summary judgment motion, plaintiff

23 states that during the June 12, 2009 hearing before the IJ, the IJ

24 considered plaintiff's motion for continuance, and as part of that

25 proceeding, "[e]veryone at the hearing," (whom plaintiff identifies

26 as plaintiff, the IJ, and the lawyer representing the Department of

27 Homeland Security) recognized the precedential effect of Martinez-

28 Montalvo.  Pltf's Resp. to Defts' Mtn at p. 4, n.4.  Plaintiff

14 - OPINION & ORDER

argues that Martinez-Montalvo inflicts a concrete injury on him now because, as a result of that decision, he is denied the opportunity to seek adjustment of status as part of his removal proceeding. Thus, he argues, the legal issues he raises in his fourth and fifth claims have been finally decided by the BIA and he is entitled to immediate judicial review of those issues.

There are at least two problems with plaintiff's argument. First, the record of the proceedings before the IJ are not part of the Administrative Record in the instant case and thus, there is no admissible evidence in this case to show that the IJ has made any decision whatsoever about the effect of Martinez-Montalvo on plaintiff's adjustment application. Second, there is simply no record of any determination actually made in plaintiff's case precluding plaintiff from seeking to adjust his status before the IJ. Thus, there simply is nothing in plaintiff's case, as of yet, to review.

Even if there were a written order from the IJ resolving all of the issues involved in plaintiff's removal proceeding, including his asylum application, his adjustment application, and his request to cancel the removal order, plaintiff may not seek judicial review of the IJ decision without first exhausting his administrative remedies. A court may review a final order of removal only if "the alien has exhausted all administrative remedies available to the alien as of right[.]" 8 U.S.C. § 1252(d)(1); see also Puga v. Chertoff, 488 F.3d 812, 814-15 (9th Cir. 2007) (describing 8 U.S.C. § 1252(d)(1) as a "statutorily-mandated administrative exhaustion requirement"). Plaintiff has the right to appeal the IJ's removal order decision to the BIA. 8 C.F.R. §§ 1003.1(b)(3), 1240.15.

15 - OPINION & ORDER

Thus, the regulatory scheme requires him to appeal to the BIA before a determination is considered a final order.

If and when plaintiff obtains a decision from the BIA, plaintiff will then have exhausted his administrative remedies and will have a final order subject to judicial review. Such review is directly to the circuit court, not the district court. Under 8 U.S.C. § 1252(b)(9),

> [j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.

8 U.S.C. § 1252(b)(9). The final order, and any questions of law and fact contained therein, is reviewed only through a "petition for review" filed with the appropriate circuit court of appeals which is the "sole and exclusive means for judicial review of an order of removal[.]" 8 U.S.C. § 1252(a)(5); see also Alvarez-Barajas v. Gonzales, 418 F.3d 1050, 1052 (9th Cir. 2005) (noting that the "REAL ID Act of 2005" expanded the jurisdiction of the circuit courts over final orders of removal and made the circuit courts the "sole" judicial body able to review challenges to such final orders).

Plaintiff relies on the "futility exception" to the exhaustion requirement to argue that he may presently obtain judicial review. The Ninth Circuit addressed the futility exception in Sun v. Ashcroft, 370 F.3d 932 (9th Cir. 2004). There, the plaintiff argued that certain claims should be excused from exhaustion because a prior en banc BIA decision foreclosed the arguments he made for the first time in his habeas petition. Id. at 941. The

16 - OPINION & ORDER

court recognized the general principle that "[w]here a statute specifically requires exhaustion, the requirement is not excused based merely on a judicial conclusion of futility." Id. (internal quotations and brackets omitted).

But, the court also noted that 8 U.S.C. 1252(d)(1) requires the exhaustion of administrative remedies which are available to the alien "as of right." Id. The court then explained that "[s]ome issues may be so entirely foreclosed by prior BIA case law that no remedies are available as of right with regard to them before IJs and the BIA." Id. at 942 (internal quotation and ellipsis omitted). The court stated that the "realm of such issues, however, cannot be broader than that encompassed by the futility exception to prudential [e.g., non-statutory] exhaustion requirements." Id.

Following that principle, the court looked at the non-constitutional claims the plaintiff raised in his habeas petition and the BIA en banc case the plaintiff contended foreclosed raising those arguments. The court concluded that the BIA case did not establish the law so firmly as to make plaintiff's administrative remedy to the BIA unavailable as of right. Id. at 943-44. Thus, under Sun, while futility is generally not an exception to the exhaustion requirement, futility may be recognized if the BIA case law is firm and settled on a particular issue.

Here, Martinez-Montalvo is a single, recent BIA decision that overruled an earlier case. Although there was an intervening change in regulation, a single case is hardly a body of law which firmly establishes the BIA's position. More importantly, however, nothing in the Martinez-Montalvo decision indicates that the BIA

17 - OPINION & ORDER

considered the arguments that plaintiff makes here as to why that
decision was wrongly decided (including noting the different
regulatory purposes of the CAA and the INA, and the issuance of the
regulation under a grant of power to implement the INA, not the
CAA). Thus, the law is not as fully developed and set as plaintiff
suggests. Additionally, while the BIA applied its conclusion to
the alien in the <u>Martinez-Montalvo</u> case, there was no indication
that the alien had raised the retroactive application argument that
plaintiff raises here in his fifth claim for relief. Under <u>Sun</u>,
even if there were a decision in this case by an IJ which was
capable of review, the requirements for an exception to exhaustion
based on futility are not established.

I grant defendants' motion to dismiss plaintiff's fourth and
fifth claims for relief because this Court lacks subject matter
jurisdiction over those claims.

III. Subject Matter Jurisdiction Over Plaintiff's First
     & Third Claims for Relief

These two claims challenge the October 14, 2009 denial by the
USCIS of plaintiff's second adjustment application. In the first
claim, plaintiff contends that the adjudication of his adjustment
application was based on an inappropriate legal standard. In the
third claim, he contends that the denial was not based on
substantial evidence in the record.

At this point, it is sufficient to note that the USCIS
provided two bases for denying plaintiff's application. First, the
USCIS found "sufficient, reasonable, substantial, and probative
evidence to support a finding" that plaintiff is or was, an
"illicit trafficker in a controlled substance," or has been a

"knowing assister, abettor, conspirator, or colluder with others in the illicit trafficking in a controlled substance" and thus the USCIS denied plaintiff's application pursuant to 8 U.S.C. § 1182(a)(2)(C)(i). AR at p. 5. Second, and alternatively, the USCIS relied on 8 U.S.C. § 1255(a) and concluded that adverse factors outweighed positive factors and thus, "as a separate, distinct and independent ground," the application was "denied as a matter of discretion." Id. at p. 7.

Defendants contend that because the adjustment application was denied as a matter of discretion, this Court lacks subject matter jurisdiction to review it. The relevant portion of 8 U.S.C. § 1252 states, in pertinent part, that

> (B) Notwithstanding any other provision of law (statutory or nonstatutory), . . . . and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review -
>
> * * *
>
>> (ii) any other decision or action of the Attorney General . . . the authority for which is specified under this subchapter to be in the discretion of the Attorney General. . . other than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B)(ii).

Ninth Circuit cases interpreting section 1252(a)(2)(B)(ii) make clear that a discretionary denial of adjustment under section 1255(a) is unreviewable under section 1252(a)(2)(B)(ii), even when the discretionary denial is an alternative basis for denying adjustment. Hassan v. Chertoff, 593 F.3d 785, 788-89 (9th Cir. 2010) ("judicial review of a discretionary determination is . . . expressly precluded by 8 U.S.C. § 1252(a)(2)(B)(ii)"); Hosseini v. Gonzales, 471 F.3d 953, 956 (9th Cir. 2006) (the court "lack[s]

1  jurisdiction to review the BIA's denial of [the plaintiff's]

2  adjustment of status claim because the BIA alternatively denied

3  relief as a matter of discretion.").[4]

4      Plaintiff argues that section 1252(a)(2)(B)(ii) does not apply

5  here because it is limited to discretionary decisions allowed by

6  the INA, not to discretionary decisions made under the CAA.  The

7  language in section 1252(a)(2)(B)(ii) withdrawing judicial

8  jurisdiction and review of discretionary determinations has a

9  limitation as seen in the underlined language below:

10      Notwithstanding any other provision of law . . . no court
        shall have jurisdiction to review . . . any other
11      decision or action of the Attorney General or the
        Secretary of Homeland Security the authority for which is
12      specified under this subchapter to be in the discretion
        of the Attorney General or the Secretary of Homeland
13      Security . . . .

14  8 U.S.C. § 1252(a)(2)(B)(ii) (emphasis added).

15      Plaintiff argues that the discretion given to the Attorney

16  General to deny or grant an adjustment application made pursuant to

17  the CAA is not given pursuant to "this subchapter" because,

18  according to plaintiff, "this subchapter" refers only to the INA,

19  not the CAA.  While no reported decision from any court appears to

20  have squarely addressed the issue, the Supreme Court recently

21  noted, in resolving a different issue, that the reference in

22  section 1252(a)(2)(B)(ii) to "this subchapter" is to "Title 8,

23  Chapter 12, Subchapter II, of the United States Code, codified at

24  8 U.S.C. §§ 1151-1391 and titled 'Immigration.'").  Kucana v.

25

26  ────────────────

27      [4]  Although there is an exception for colorable
    constitutional violations, Hassan, 593 F.3d at 789, plaintiff
    raises no constitutional issues in his first and third claims for
28  relief.

20 - OPINION & ORDER

1    _Holder_, 130 S. Ct. 827, 832 n.3 (2010) (holding that section
2    1252(a)(2)(B)(ii) barred jurisdiction of decisions specified by
3    statute as discretionary but did not bar decisions specified by
4    regulation as discretionary); _see_ _also_ _Medina-Morales v. Ashcroft_,
5    371 F.3d 520, 528 (9th Cir. 2004) (noting that section
6    1252(a)(2)(B)(ii) refers to acts "the authority for which is
7    specified under the INA to be discretionary") (brackets omitted).

8        The issue is complicated by the fact that the CAA is not
9    codified in the United States Code, but appears only after section
10   1255(a). _See Santana Gonzalez v. Attorney General of the U.S._, 506
11   F.3d 274, 280-81 (3d Cir. 2007) (citing to CAA as follows: "Cuban
12   Adjustment Act, Pub. L. No. 89-732, [80] Stat. 1161 (1966)
13   (reproduced as historical note to 8 U.S.C. § 1255"); _Federation for_
14   _Am. Immigration Reform v. Reno_, 93 F.3d 897, 899 (D.C. Cir. 1996)
15   (same).[5]

16       If reproduction of the CAA following section 1255 is enough to
17   make the CAA part of the INA, then section 1252(a)(2)(B)(ii)
18   applies and bars review of the USCIS's discretionary denial of
19   plaintiff's adjustment status application by any court.  If the CAA
20   is not considered part of the INA, then the statutory
21   jurisdictional bar is inapplicable and this Court may review the
22   determination.

23   _____

24       [5]   In the United States Code itself, the CAA appears
25   following section 1255(a) with no designation whatsoever,
     including no designation as a historical note.  In the United
26   States Code Annotated, published by West Publishing Company, it
     appears after section 1255(a) and is designated a historical
27   note.  In the United States Code Service, published by Matthew
     Bender & Co, it appears after section 1255(a) and is designated
28   under a section entitled "[o]ther provisions."

21 - OPINION & ORDER

1    In pertinent part, section 1 of the CAA states that

2    notwithstanding the provisions of section 245(c) of the
     [INA], the status of any alien who is a native or citizen
3    of Cuba and who has been inspected and admitted or
     paroled into the United States subsequent to January 1,
4    1959 and has been physically present in the United States
     for at least one year, may be adjusted by the Attorney
5    General, in his discretion and under such regulations as
     he may prescribe, to that of an alien lawfully admitted
6    for permanent residence if the alien makes an application
     for such adjustment, and the alien is eligible to receive
7    an immigrant visa and is admissible to the United States
     for permanent residence.

8
CAA, Pub. L. 89-732, 80 Stat. 1161 (1966) (reproduced following 8
9
U.S.C. § 1255(a)).   Section 4 of the CAA further provides that
10
     the definitions contained in section 101(a) and (b) of
11   the [INA] shall apply in the administration of this Act.
     Nothing contained in this Act shall be held to repeal,
12   amend, alter, modify, affect, or restrict the powers,
     duties, functions, or authority of the Attorney General
13   in the administration and enforcement of the [INA] or any
     other law relating to immigration, nationality, or
14   naturalization.

15   Id.

16       As can be seen from section 1, and as the Ninth Circuit has

17   noted, the language in the CAA is similar to that of section

18   1255(a).   Ortega-Cervantes v. Gonzales, 501 F.3d 1111, 1118 (9th

19   Cir. 2007) ("Cuban Adjustment Act . . . uses language similar to §

20   1255(a)."); see also Ibarra v. Swacina, No. 09-22354, 2009 WL

21   4506544, at *1 (S.D. Fla. 2009) ("The language of the [CAA] mirrors

22   that of § 1255(a)[.]").   And, as can be seen from section 4, the

23   CAA expressly provides that it is not intended to interfere with

24   the administration of the INA, or any other immigration-related

25   law.   Thus, one could argue that given the similarity in language

26   between the CAA and section 1255(a), the fact that the CAA may not

27   restrict the enforcement of the INA or other immigration laws, and

28   that the CAA is appended to section 1255(a), the CAA should be

considered part of the INA for purposes of the application of section 1252(a)(2)(B)(ii).

During oral argument, defendants' counsel posited that the material found in historical notes to statutes reproduced in the United States Code Annotated (USCA), was placed there by order of a special congressional committee. Although defendants' counsel was unable to provide any authority to support this assertion at the time, I have found that in 1974, Congress established the Office of Law Revision Counsel as part of the House of Representatives. 2 U.S.C. § 285. The principal purpose of the Office of Law Revision Counsel is "to develop and keep current an official and positive codification of the laws of the United States", 2 U.S.C. § 285a, and it is responsible for preparing and publishing the United States Code. 2 U.S.C. §§ 285a-285g.

A 1986 law journal article addressing the codification process for federal laws, explains that public laws are published in the United States Statutes at Large and that Congress has directed the Archivist of the United States to compile, edit, index, and publish in the Statutes at Large, all the laws, concurrent resolutions, proclamations by the President, and constitutional amendments issued during each session of Congress. Questions & Answers, 78 Law Libr. J. 585, 591 (1986). The United States Code, a subject matter arrangement of statutes, is a consolidation and codification of all the general and permanent laws of the United States in force at the time of publication. Id. As noted above, the Office of Law Revision Counsel prepares and publishes the United States Code. Id.

The journal article notes that the Office of Law Revision

23 - OPINION & ORDER

Counsel prepares and submits new editions of the United States Code
to the Committee on the Judiciary, which publishes new editions and
supplements to the United States Code.  Id.  The article further
notes that there are numerous statutes and sections of statutes
that never are codified.  Id.  As explained in the article, the
Office of Law Revision Counsel supplies the Archivist of the United
States with the codification information that appears in the
margins of the official slip laws and Statutes at Large.  Id. at
592.  The Office of Law Revision Counsel selects for inclusion in
the Code all provisions of a statute that it considers general and
permanent in nature.  Id. Exclusion of a statute or a section from
the United States Code does not affect its validity.  Id.  The
article explains that in compiling the United States Code, the
Office of Law Revision Counsel also includes material, either in
notes or appendixes, to aid in the construction and interpretation
of the United States Code.  Id.

In a recent Ninth Circuit case, the court, citing to Questions
& Answers, noted that "codification decisions are ordinarily not
made by Congress[.]"  Ledezma-Galicia v. Holder, 599 F.3d 1055,
1063 n.9 (9th Cir. 2010).  Plaintiff, citing to this decision and
to Questions & Answers, contends, in a post-hearing filing, that
the appearance of a note is an editorial decision of the Office of
the Law Revision Counsel, not a decision by Congress.

Defendants, in response to plaintiff's post-hearing filing,
contend that because the Office of Law Revision Counsel submits its
editions of the United States Code to the Committee on the
Judiciary, it is that Committee, not the Office of Law Revision
Counsel, which makes the ultimate determination of where a law is

placed in the United States Code.  Additionally, defendants argue that because the actual public law text of a 1976 amendment to the CAA contains a parenthetical reference to the CAA being found at "8 U.S.C. 1255, note," the placement of the CAA following section 1255 was indeed a Congressional Act.

I disagree with defendants that the 1976 public law's reference to the CAA's location within the United States Code demonstrates that Congress actually placed the CAA there.  Notably, while the Office of Law Revision Counsel has had authority since 1974 for placement of federal laws into the United States Code, it is unclear what authority it has over laws passed before that date, such as the original CAA.  And, it is still entirely unclear to this Court why the CAA was not codified.  Most importantly, it remains equally unclear that the presence of the CAA following section 1255(a) was intended by Congress to indicate that the CAA should be read as part of the INA.  Even if Congress itself placed the CAA in a note following section 1255(a), that does not, without more, conclusively show that Congress meant for the CAA to become part of the INA.

Additionally, I note that in the Artigas decision, the BIA itself distinguished between adjustment status applications made pursuant to "section 245 of the Act," meaning made pursuant to section 1255(a) of the INA, and adjustment status applications made under the CAA.  Artigas, 23 I&N Dec. at 104.  The court further explained that "by specifically barring only section 245 relief . . ., but making no mention of relief under the [CAA], the Attorney General has declined to exercise her discretion to bar [CAA] applications."  Id.  The BIA's decision in Artigas is inconsistent

25 - OPINION & ORDER

1 with any argument that the CAA is to be considered part of section
2 1255(a) of the INA.[6]

3     This is a close question and one I do not resolve because, as
4 explained below, even if this Court has jurisdiction to review the
5 denial of plaintiff's adjustment application, I conclude that the
6 USCIS's decision should be affirmed.

7 IV.  The Denial of Plaintiff's Adjustment Application

8     As noted above, the USCIS denied plaintiff's second adjustment
9 application under section 1182(a)(2)(C)(i), and alternatively, in
10 the exercise of its discretion after determining that the adverse
11 factors outweighed the positive factors.  I do not address the
12 section 1182(a)(2)(C)(i) decision because I determine that the
13 discretionary determination is free of legal error and is supported
14 by substantial evidence.

15     According to the USCIS, plaintiff was arrested and/or charged
16 with the following:  (1) on or about May 1, 1980, for "Sale or
17 Transportation of Marijuana"; (2) on or about October 7, 1980, for
18 "Grand Theft"; (3) on or about November 17, 1994, for "Menacing,
19 Recklessly Endanger Another, Carry Concealed/Unlawful Possession
20 Firearm"; and (4) on or about March 12, 1998, for "Contempt of
21 Court/Punitive Violation of Restraining Order."  AR at p. 6.

22     The USCIS also found that plaintiff was convicted of the
23 following:  (1) "Grand Theft" on October 7, 1980; (2) "32PC
24 (Accessory)" on December 2, 1980; (3) "Carry Concealed/Unlawful

25

26     [6] Although Martinez-Montalvo overruled Artigas, the
27 decision was based on an intervening change in regulations, not
on a change by the BIA in its treatment of the CAA as distinct
28 from the INA.

1    Possession Firearm" on February 3, 1995; and (4) "Punitive Contempt

2    of Court/Violation of Restrain Order" on April 17, 1998.  Id.

3         The USCIS decision then states that

4         [t]he applicant was advised of this adverse information
          in an "Intent to Deny" issued on August 31, 2009.  The
5         response to the "Intent" was received on September 30,
          2009.  However, the applicant did not submit evidence
6         that would indicate that this discretionary application
          should be approved based on the adverse factors outlined.
7         The applicant stated that this discretionary application
          should be adjudicated through the appropriate lens of the
8         Cuban Adjustment Act, and use a less stringent standard.
          It was also stated that the applicant has significant
9         family ties in the United States, and notes his longevity
          here as well as the hardships for his family if this
10        application would be denied.

11   Id.

12        The USCIS concluded that plaintiff's "involvement in multiple

13   criminal acts as well as the serious nature of these acts reflects

14   a disregard for the laws of the United States."  Id. at p. 7.  The

15   USCIS explained that it had thoroughly reviewed the evidence and

16   afforded "due consideration to all positive factors, such as, but

17   not limited to, length of time in the United States, family ties,

18   etc."  Id.  Although plaintiff appeared to be statutorily eligible

19   to adjust status, the USCIS concluded that the adverse factors

20   greatly outweighed the "limited positive factors" in his case.  Id.

21        The USCIS also rejected plaintiff's "proposed framework of

22   treating Cuban Adjustment Act adjustment applications under refugee

23   law as opposed to adjustment of status in INA sec. 245[.]"  Id.

24   The USCIS then noted that the record did not indicate a showing of

25   unusual or outstanding equities on plaintiff's behalf that offset

26   plaintiff's adverse factors.  Id.  Therefore, "as a separate,

27   distinct  and  independent  ground,"  the  USCIS  denied  "this

28   application . . . as a matter of discretion."  Id.

27 - OPINION & ORDER

1    In reviewing the USCIS's denial of plaintiff's adjustment
2    application, the court reviews questions of law under a de novo
3    standard. <u>Altamirano v. Gonzales</u>, 427 F.3d 586, 591 (9th Cir.
4    2005) (court reviews "purely legal questions concerning the meaning
5    of the immigration laws de novo") (internal quotation omitted).
6    Findings of fact are reviewed for substantial evidence. <u>Hernandez</u>
7    <u>v. Ashcroft</u>, 345 F.3d 824, 832 (9th Cir. 2003) (determinations of
8    fact, including determinations regarding eligibility for adjustment
9    of status, are reviewed for substantial evidence).

10    The "substantial evidence" standard is "extremely
11    deferential." <u>Singh-Kaur v. INS</u>, 183 F.3d 1147, 1149 (9th Cir.
12    1999) (internal quotation omitted).

13       The court must uphold the BIA's findings unless the
      evidence presented would <u>compel</u> a reasonable finder of
14    fact to reach a contrary result, . . . .; however, minor
      inconsistencies in the record are not an adequate basis
15    for an adverse credibility finding, . . . . The
      possibility of drawing two inconsistent conclusions from
16    the evidence does not prevent an administrative agency's
      finding from being supported by substantial evidence. .
17    . . .

18    <u>Id.</u> (internal quotations, citations, and brackets omitted).

19    Plaintiff argues that an application for a discretionary
20    adjustment of status under the CAA is not analyzed under 8 U.S.C.
21    § 1255, but rather, is properly analyzed under laws and principles
22    developed for those applying for asylum under 8 U.S.C. § 1258(b).
23    Plaintiff cites to no case law, statute, or regulation that
24    expressly supports this argument. Instead, plaintiff suggests that
25    because the CAA was meant as an ameliorative program to protect
26    Cubans fleeing the Castro regime, Congress intended the CAA to
27    operate similarly to "the asylum mechanism."

28    There is some authority to support the proposition that the

28 - OPINION & ORDER

1   CAA is remedial in nature and thus, should be construed liberally.

2   Matter of Mesa, 12 I&N Dec. 432 (BIA 1967) (further noting that the

3   purpose of the CAA "is to provide a ready means to permit certain

4   Cuban refugees in the United States to adjust to permanent resident

5   status, in the discretion of the Attorney General[.]"); see also

6   Note, The Cuban Adjustment Act of 1966: ?Mirando Por Los Ojos de

7   Don Quijote or Sancho Panza?, 114 Har. L. R. 902, 910-11 (2001)

8   (discussing four separate bases motivating Congressional passage of

9   the CAA, including humanitarian concerns of providing a safe haven

10  for victims of persecution, as well as national security concerns,

11  reducing administrative burdens on Cuban refugees already in the

12  United States, and providing an expeditious way by which Cuban

13  refugees in the United States could join the American workforce).

14      Nonetheless, I agree with defendants that the USCIS did not

15  err in applying cases and law developed under 8 U.S.C. § 1255(a) to

16  guide its discretion in analyzing plaintiff's application under the

17  CAA.  Several reasons support this conclusion.

18      First, there is no statute, regulation, court decision, or BIA

19  decision affirmatively establishing a distinct analysis used for

20  CAA adjustment applications.  Second, I agree with defendants that

21  plaintiff's status as a parolee is analogous to that of a person

22  having been already been granted asylum and thus, is

23  distinguishable from one seeking asylee or refugee status.

24  Plaintiff's contention that asylum or refugee law should be used to

25  adjudge his CAA adjustment application is unsupportable because

26  plaintiff, as a result of being a parolee, is in effect already

27  similarly situated to an asylee or refugee.

28      As explained in the Harvard Law Review article, an immigrant

29 - OPINION & ORDER

from Cuba does not need to apply for political asylum and establish
a well-founded fear of persecution before seeking permanent
resident status because the CAA allows Cubans to bypass the asylum
process. Id. at 905-06. "Cuban immigrants who flee to the United
States . . . receive preferential treatment, as they are not
required to apply for political asylum or prove that they are
refugees." Id. at 906. Rather, they "circumvent the asylum
process because they are generally paroled into the country." Id.
at 907.

Immigrants from countries who contend they are victims of
persecution must first establish their status as a refugee or
asylee, and then they may seek an adjustment to permanent resident
status. See 8 U.S.C. §§ 1157 (governing annual admission of
refugees and admission of emergency situation refugees), 1158
(governing asylum) 1159 (governing adjustment of status of refugees
and asylees). The statutory scheme establishes two separate steps
for such immigrants.

The same is true of Cuban immigrants seeking adjustment under
the CAA. They must first have been paroled into the country and
then they may separately seek adjustment of status. The act of
parole is the procedural equivalent to the admission of an
individual as an asylee or refugee. Accordingly, an application to
adjust status under the CAA is not parallel to a request for
asylum. The former is the second step in a two-step process while
the latter is the first step in a two-step process and it would be
error to equate them.

Third, the Ninth Circuit suggests that the discretionary
determinations allowed by the INA for waiver of deportation,

30 - OPINION & ORDER

voluntary departure, and adjustment of status, all use a balancing of the equities inquiry. Paredes-Urrestarazu v. INS, 36 F.3d 801, 810 (9th Cir. 1994) (discretionary determinations made in waiver of deportability cases, voluntary departure cases, and adjustment of status cases, all involve the "same type of balancing of equities"); see also Vargas-Hernandez v. Gonzales, 497 F.3d 919, 924 n.4 (9th Cir. 2007) (noting that equities in a section 212(c) analysis (seeking waiver of deportation), are similar to those used in adjustment of status). I see no principled reason for distinguishing CAA adjustment applications from the other discretionary determinations made under various provisions of the INA.

Fourth, the most similar statute in the INA to the CAA is 8 U.S.C. § 1255. Finally, I note that in 2010, the purposes behind the CAA and giving Cuban immigrants preferential treatment in becoming permanent residents no longer appear relevant. See Cuban Adjustment Act of 1966, 114 Harv. L. Rev. at 911-14 (explaining why the four justifications for the CAA are outdated). Any vitality that plaintiff's argument regarding equating CAA adjustment applications to asylum applications might have had in the 1960s and 1970s is largely absent today.

Under the de novo standard of review used to review questions of law, I conclude that the USCIS properly relied on the law and analysis developed under 8 U.S.C. § 1255 to adjudicate plaintiff's adjustment application under the CAA and thus, the USCIS made no errors of law. I next consider whether the USCIS's decision is supported by substantial evidence.

Because the decision to grant an adjustment of status is

31 - OPINION & ORDER

"purely discretionary" and constitutes an "extraordinary remedy to be granted only in meritorious cases," the alien bears the burden of proof and of persuading the USCIS to exercise its discretion favorably. Eide-Kahayon v. INS, 86 F.3d 147, 150 (9th Cir. 1996). When making a discretionary determination, the BIA must "explain what factors it has considered or relied upon sufficiently that we are able to discern that it has heard, considered, and decided." Kalubi v. Ashcroft, 364 F.3d 1134, 1140-41 (9th Cir. 2004) (internal quotation omitted).  The BIA's conclusion must be "explained with enough clarity that we can understand the rationale." Id. at 1141.

In discretionary determination cases, including adjustment cases, the agency is required to balance positive versus negative factors. E.g., Vargas-Hernandez v. Gonzales, 497 F.3d 919, 924 n.5 (9th Cir. 2007) (citing In re Mendez-Moralez, 21 I&N Dec. 296, 299-300 (BIA 1996) for proposition that exercise of discretion is a case by case balancing for all forms of discretionary relief); Rashtabadi v. INS, 23 F.3d 1562, 1570 (9th Cir. 1994) (noting that "[o]ne general, analytical approach governs all decisions on whether to grant discretionary relief . . . . The BIA or the IJ decides whether an applicant is entitled to a favorable exercise of agency discretion [under § 245] on a case by case basis by taking into account the social and humane considerations presented in an applicant's favor and balancing them against the adverse factors that evidence the applicant's undesirability as a permanent resident.") (internal quotation omitted, bracket in Rashtabadi); see also Matter of Arai, 13 I&N Dec. 494, 496 (BIA 1970) ("[w]here adverse factors are present in a given application, it may be

32 - OPINION & ORDER

necessary for the applicant to offset these by a showing of unusual or even outstanding equities").

As noted above, in support of the discretionary denial of plaintiff's adjustment application, the USCIS noted four arrests and four convictions. AR at p. 6. Plaintiff admits that he was arrested in Josephine County, Oregon, for Menacing, Recklessly Endangering, and Carrying a Concealed/Possession of a Firearm, and as a result of this arrest, on February 3, 1995, was convicted of Carrying a Concealed/Possession of a Firearm and sentenced to three years of probation. AR at pp. 6, 118-20, 292. Plaintiff also admits that he was arrested in Josephine County, Oregon, on March 12, 1998 for Contempt of Court and as a result, on April 17, 1998, was convicted of Punitive Contempt of Court - Violation of a Restraining Order and sentenced to twelve months of probation. AR at pp. 6, 123-24, 292.

Plaintiff contests the USCIS's assertions that he was arrested for or charged with the sale or transportation of marijuana in 1980, that he was convicted in December 1980 of "32PC (Accessory)," that he was arrested or charged with "Grand Theft," on or about October 7, 1980, and that he was convicted of "Grand Theft," on or about October 7, 1980. He contends that the evidence in the Administrative Record regarding these two arrests and convictions is unreliable, not substantial, and may not be used against him in the relevant balancing inquiry.

The primary record regarding the marijuana arrest and later conviction consists of three pages from the Los Angeles Police Department, with the first labeled "Arrest Report," the second labeled "Continuation Sheet," and the third labeled "Disposition of

33 - OPINION & ORDER

1   Arrest and Court Action." AR at pp. 293-95. None of the three

2   pages in the Administrative Record is easy to read, but, it is

3   readily apparent that the first page indicates that plaintiff, or

4   someone with his name, was arrested for a "Hard Narc" offense

5   occurring May 1, 1980, at the "Hardor" or "Harbor" "OCC School."

6   AR at p. 293. There is a reference to "11360(A) H&S SL OR TRS

7   MARIJ." Id. There's a handwritten reference to evidence of "Buy

8   Notes." Id. The next page are handwritten notes indicating that

9   officers learned from "buy notes" that Undercover Officer Holguin

10  purchased marijuana on February 9, 1980 from plaintiff. AR at p.

11  294. The page also indicates that plaintiff was arrested for

12  "11360(A), H&S Sale of Marij" and was then booked at Harbor

13  Station. Id.

14      The third page suggests that the 11360 charge was a felony to

15  which plaintiff initially pleaded not guilty, but which was then

16  later dismissed. AR at p. 295. The record also suggests that

17  plaintiff pleaded guilty to a second charge of "32PC," also a

18  felony, for which he received thirty-six months of probation. Id.

19  It shows a date of sentence of December 2, 1980. Id. Admittedly,

20  this page is difficult to read and there is no guide to the various

21  abbreviations used. But, even so, it is sufficiently discernable

22  and understandable to support a suggestion that plaintiff pleaded

23  guilty to some charge connected with the February 1980 marijuana

24  arrest.

25      The other record regarding these arrests and convictions is a

26  four-page FBI criminal history printout. AR at pp. 289-93. That

27  record recites that plaintiff was arrested and charged with the

28  sale or transportation of marijuana on May 1, 1980, by the Los

34 - OPINION & ORDER

Angeles Police Department, and that this charge was dismissed on December 2, 1980, but on that same date, plaintiff was convicted of "32PC" for which he received 120 days of confinement, followed by thirty-six months of probation.  Id.  This record also shows that on January 3, 1983, the charge was dismissed and the "32PC" conviction was set aside.  Id.

The FBI criminal history printout is the only record showing the arrest and conviction for "grand theft."  AR at p. 291.  It recites an October 10, 2007 arrest by the Hemet Police Department for which plaintiff was subsequently convicted and received ninety days confinement and two years of probation.  Id.

Plaintiff argues that the Los Angeles Police Department and FBI records do not support the USCIS's factual findings regarding his marijuana arrest, his "32PC" conviction, his grand theft arrest, and his grand theft conviction.  He argues that the reliability of the Los Angeles Police Department Records is "dubious at best" because the arrest report is based on an unidentified individual's impression of some other individual's notes, which are not part of the record.  He also contends that it is impermissible to rely on the fact of an arrest to support a negative inference about his conduct.

The question on review is whether the USCIS's factual findings are supported by substantial evidence on the record as a whole. E.g., INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (defining substantial evidence review for asylum claims); Abebe v. Gonzales, 432 F.3d 1037, 1039-40 (9th Cir. 2005) (noting that agency determinations are to be affirmed if they are supported by "reasonable, substantial, and probative evidence on the record

35 - OPINION & ORDER

considered as a whole") (internal quotation omitted).

Here, plaintiff concedes the two convictions from the 1990s. Although they are approximately twelve and fifteen years old, they are not insignificant.  As to the marijuana arrest and subsequent "32PC" conviction, which, apparently, was later dismissed, the Los Angeles Police Department three-page report is sufficient to indicate that plaintiff was arrested in 1980 for the sale and transportation of marijuana and was later convicted for some offense in connection with that arrest.

The FBI report provides additional confirmation of the arrest and subsequent conviction.  Even though the record fails to establish what "32PC" is, the police report and the FBI report show that the conviction was related to the marijuana arrest.  Moreover, plaintiff offers no reason to reject as unreliable the information in the FBI criminal history printout showing both the marijuana-related arrest and conviction and the "grand theft" arrest and conviction.

In Paredes-Urrestarazu, the plaintiff argued that a prior narcotics charge could not be used in determining whether he was deserving of discretionary relief from deportation under 8 U.S.C. § 1182(c) because the charges against him were dismissed after his successful completion of a diversion program established by state law.  The state diversion law explicitly provided that "[u]pon successful completion of a diversion program the arrest upon which the diversion was based shall be deemed to have never occurred."  36 F.3d at 805 n.2.  In addition to other arguments, the plaintiff contended that the "FBI Rap Sheet" reflecting the narcotics charge, could not be admitted by the IJ because to do so would violate the

state diversion statutes.

The Ninth Circuit rejected the plaintiff's argument and held that the BIA did not have to give effect to the diversion program in making a discretionary determination. Id. at 808-15. Having reached that conclusion, the Ninth Circuit then dismissed the plaintiff's concern that the IJ should not have introduced the FBI Rap Sheet into the administrative record.   Id. at 816; see also Rosales-Pineda v. Gonzales, 452 F.3d 627, 630-32 (7th Cir. 2006) (BIA did not err in relying on information in FBI "Rap Sheet" as evidence that "reasonably indicated the existence of a criminal conviction" when some of the information was confirmed by other evidence in the record).

There is no dispute that plaintiff was made aware of the USCIS's intent to rely on these arrests and convictions in considering his adjustment application. The August 31, 2009 NOID made express reference to these arrests and convictions and cited to them as support for the proposed denial of plaintiff's application. AR at pp. 8-12. In response to the NOID, plaintiff submitted several documents including a letter memorandum, photographs, letters from family members and friends, and an unsworn, signed statement from plaintiff stating simply that "the synopsis contained in the Notice of Intent to Deny about me and the 1980 arrest is inaccurate and false." AR at pp. 13-84.

The "synopsis" plaintiff referred to is the following statement by the USCIS in the NOID: "On February 9, 1980, an undercover officer purchased marijuana from the applicant in a sting operation. The applicant was then arrested by law enforcement. The applicant was subsequently charged with the 'Sale

37 - OPINION & ORDER

1  or Transportation of Marijuana.'"    AR at pp. 10-11.    Notably,

2  plaintiff's response to the NOID was to simply deny the accuracy of

3  this statement.    Also, plaintiff's statement refers only to the

4  "synopsis" which addresses only the marijuana arrest and thus,

5  plaintiff appears to have never challenged the USCIS's reliance on

6  the grand theft arrest and conviction.    Although plaintiff bears

7  the burden of proof and the burden of persuading the USCIS to

8  exercise its discretion in his favor, he failed to submit any

9  explanation of the arrest or additional facts regarding the

10  circumstances of the underlying incident. Without such explanation

11  or additional facts, he fails to demonstrate why the information in

12  the Los Angeles Police Department and FBI records is inaccurate or

13  unreliable.

14      Plaintiff also contends that it is error for the USCIS to rely

15  only on the fact of an arrest in making its determination.    I do

16  not read the USCIS's discretionary determination as relying solely

17  on the fact of an arrest.    Rather, the USCIS relied on the history

18  of four arrests and four convictions. Even though the FBI criminal

19  history printout indicates that the marijuana conviction was later

20  set aside, there are three other criminal convictions established

21  in the record.

22      Additionally, even if the USCIS had relied on the fact of

23  plaintiff's marijuana arrest alone, it would not have been error in

24  this case.    As the parties note, no conviction is required to

25  support a denial of an adjustment application based on 8 U.S.C. §

26  1182(a)(2)(C)(i), the drug trafficker statute.    See Lopez-Umanzor

27  v. Gonzales, 405 F.3d 1049, 1053 (9th Cir. 2005) ("Section

28  1182(a)(2)(C) does not require a conviction, but only a 'reason to

38 - OPINION & ORDER

believe' that the alien is or has been involved in drug trafficking"); Lopez-Molina v. Ashcroft, 368 F.3d 1206, 1209 (9th Cir. 2004) ("Section 1182(a)(2)(C) . . . does not require a conviction in order for the alien to be deemed removable"). If a conviction is not required as a basis for determining statutory ineligibility under section 1182(a)(2)(C), it is similarly not required as a basis for the exercise of discretion.

Additionally, while the Ninth Circuit has, as plaintiff notes, indicated it would be "troubled" by the BIA finding the "mere fact of an arrest" probative of whether an alien has engaged in underlying conduct, the court also expressly made clear that

> [t]he fact of arrest, insofar as it bears upon whether an alien might have engaged in underlying conduct and insofar as facts probative of an alien's bad character or undesirability as a permanent resident arise from the arrest itself, plainly can have relevance in performing the analysis required by section 212(c) [allowing discretionary relief from deportation].

Paredes-Urrestarazu, 36 F.3d at 810 (internal quotation omitted) (further noting that the breadth of a section 212(c) inquiry "permits the Board to consider evidence of conduct that does not result in a conviction").

Furthermore, the case cited by the Ninth Circuit in support of its expression of concern about the BIA's reliance on the "mere fact of an arrest," stated, according to the Ninth Circuit, in dicta, that police reports concerning conduct for which no prosecution resulted should not have been counted as adverse factors in denying section 212(c) relief. Id. at 816 n.15 (citing Sierra-Reyes v. INS, 585 F.2d 762, 764 n.2 (5th Cir. 1978)). Here, in terms of plaintiff's marijuana arrest, there is more than a police report concerning conduct for which no prosecution was

39 - OPINION & ORDER

commenced.     The  Los  Angeles  Police  Department  arrest  report
includes  a  reference  to  the  undercover  purchase  of  marijuana  by
plaintiff.  It  refers  to  facts  regarding  the  offense.    Thus,  it  is
not  just  a  police  report  of  a  stop  absent  an  arrest,  or  absent  any
reference  to  underlying  conduct.    The  record  further  shows  that
plaintiff  was  prosecuted  for  that  conduct.

The  concern  expressed  by  Paredes-Urrestarazu  and  Sierra-Reyes
is  that  the  agency  should  not  rely  solely  on  an  arrest  absent
information  regarding  the  conduct  for  which  the  arrest  was  made.
Since  that  is  not  the  case  here,  the  USCIS  properly  considered  the
marijuana  arrest  and  its  underlying  conduct.

As  a  whole,  the  record  contains  a  combination  of  weak  and
strong  evidence  of  the  events  the  USCIS  relied  on  in  support  of  its
determination  that  plaintiff  had  a  history  of  multiple  criminal
acts.    Considering  the  evidence  in  its  totality,  the  USCIS's
factual  determinations  regarding  plaintiff's  criminal  history  of
arrests  and  convictions,  is  supported  by  substantial  evidence  in
the  record.

Plaintiff  also  argues  that  the  USCIS  erred  by  not  discussing
his  positive  factors.    But,  the  USCIS  did  specifically  note
plaintiff's  length  of  time  in  the  country  and  his  family  ties,  and
it  had  earlier  mentioned  plaintiff's  assertion  that  a  denial  of  his
application  would  create  a  hardship  on  his  family.    More  extensive
discussion  was  not  required.

The  balancing  of  equities  is  reviewed  for  an  abuse  of
discretion.    See  Paredes-Urrestarazu,  36  F.3d  at  807  (noting
standard  for  section  212(c)  cases).    In  reviewing  an  agency
determination,  whatever  decision  this  Court  might  make  in  the  first

40 - OPINION & ORDER

instance is irrelevant.  Given the record as a whole, I cannot say

that the USCIS's decision to deny plaintiff's application was

unreasonable and an abuse of its discretion.  Therefore, I affirm

the USCIS's decision and grant summary judgment to defendants on

plaintiff's first and third claims for relief.

CONCLUSION

Plaintiff's motion for summary judgment (#32) is denied.

Defendants' motion to dismiss, or alternatively for summary

judgment (#35) is granted.

IT IS SO ORDERED.

Dated this   28th  day of  May        , 2010.


 /s/ Dennis James Hubel
Dennis James Hubel
United States Magistrate Judge

41 - OPINION & ORDER